1  NICOLA T. HANNA
   United States Attorney
2  PATRICK R. FITZGERALD
   Assistant United States Attorney
3  Chief, National Security Division
   JOHN J. LULEJIAN (Cal. Bar No. 186783)
4  Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
7       E-mail:    John.Lulejian@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA



9

10                    UNITED STATES DISTRICT COURT

11                FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE            No. 19MJ01449
    EXTRADITION OF
13                                  COMPLAINT
    ADRIAN HONG CHANG,
14    aka "Adrian Hong,"            FOR PROVISIONAL ARREST WITH
      aka "Oswaldo Trump,"          A VIEW TOWARDS EXTRADITION
15    aka "Matthew Chao,"           (18 U.S.C. § 3184); ORDER THEREON

16  A Fugitive from the             **(FILED UNDER SEAL)**
    Government of the
17  Kingdom of Spain.

18

19  TO:  Honorable Jacqueline Chooljian
         United States Magistrate Judge
20       Central District of California

21       I, JOHN J. LULEJIAN, being duly sworn, depose and state that I

22  am an Assistant United States Attorney for the Central District of

23  California and act for the United States in fulfilling its

24  obligations to the Government of the Kingdom of Spain pursuant to the

25  Treaty on Extradition between the United States of America and Spain,

26  U.S.-Spain, May 29, 1970, 22 U.S.T. 737; the Supplementary Treaty in

27  Extradition between the United States of America and Spain, signed

28  January 25, 1975; the Second Supplementary Extradition Treaty between

the United States of America and the Kingdom of Spain, U.S.-Spain, Feb. 9, 1998, S. Treaty Doc. No. 102-24 (1992); the Third Supplementary Treaty between the United States of America and the Kingdom of Spain, U.S.-Spain, Mar. 12, 1996, S. Treaty Doc. No. 105-15 (1997); and the Instrument on Extradition between the United States of America and Spain, as contemplated by Article 3(2) of the Agreement on Extradition between the United States and the European Union signed 25 June 2003, as to the application of the Treaty on Extradition between the United States of America and Spain signed May 29, 1970, and the Supplementary Treaties on Extradition signed January 25, 1975, February 9, 1988 and March 12, 1996, U.S.-Spain, Dec. 17, 2004 S. Treaty Doc. No. 109-14 (2006), with Annex (collectively the "Treaty"), with respect to the fugitive, ADRIAN HONG CHANG, also known as ("aka") "Adrian Hong," aka "Oswaldo Trump," aka "Matthew Chao" ("HONG CHANG").

In accordance with Title 18, United States Code, Section 3184, I charge on information and belief as follows:

1.   That Article XI of the Treaty provides for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents.

2.   That in accordance with Article XI of the Treaty, the Government of the Kingdom of Spain ("Spain") has asked the United States for the provisional arrest of HONG CHANG with a view towards his extradition.

3.   That according to the information provided by the Government of Spain, HONG CHANG is being prosecuted for the following offenses:

  a. Breaking and Entering, in violation of Articles 202 and 203 of the Spanish Penal Code;

  b. Illegal Restraint, in violation of Articles 163 and 165 of the Spanish Penal Code;

  c. Threats, in violation of Articles 169 and 171 of the Spanish Penal Code;

  d. Robbery with Violence and Intimidation, in violation of Articles 237, 241, and 242 of the Spanish Penal Code;

  e. Causing Injuries, in violation of Article 147 of the Spanish Penal Code;

  f. Falsifying a Document, in violation of Articles 390 and 392 of the Spanish Penal Code; and

  g. Being a Member of Criminal Organization, in violation of Article 570 *bis* of the Spanish Penal Code.

4. That on or about April 2, 2019, Judge Jose de la Mata Amaya of the Central Court of Investigation No. 5, National High Court, in Madrid, Spain, issued a warrant for HONG CHANG's arrest.

5. That the offenses for which HONG CHANG's provisional arrest are sought were committed within the jurisdiction of Spain and are covered by Article II of the Extradition Treaty.

6. That the warrant was issued on the basis of the following facts:

  a. On or about February 7, 2019, HONG CHANG visited the Embassy of the Democratic People's Republic of North Korea in Madrid, Spain ("the Embassy"). While there, HONG CHANG, posing as a businessman named "Matthew Chao," spoke with Y.S.S., the Embassy's Chargé d'affaires.

   b. Approximately two weeks later, on or about February 22, 2019, at approximately 5:00 p.m., as recorded on a surveillance camera, HONG CHANG, called at the door of the Embassy, and again asked to see Y.S.S. At the time, S.J.C., H.R.Y., and S.G.J. were working in the Embassy's garden. S.J.C. opened the door, allowed HONG CHANG to enter the Embassy grounds, and asked him to wait on a bench in the patio while he went to find Y.S.S.

   c. When S.J.C. stepped away to find Y.S.S., HONG CHANG opened the door and allowed six individuals carrying knives, iron bars, machetes, and imitation handguns (collectively, "HONG CHANG's group") to enter the Embassy grounds. Members of HONG CHANG's group struck S.J.C., H.R.Y., and S.G.J., restrained them using shackles and cables, placed a bag over S.J.C.'s head, and took the three men to the Embassy's meeting room. Members of HONG CHANG's group also attacked and hit Y.S.S., and took him to a bathroom where they tied his hands behind his back, placed a bag over his head, and threatened him with iron bars and imitation handguns. Approximately 30 minutes later, members of HONG CHANG's group took Y.S.S. to the Embassy's meeting room to join the other captives.

   d. At the time of the attack, Y.S.S.'s wife and their eight-year-old son were in a locked bedroom. Members of HONG CHANG's group forced the locked door open and entered the bedroom. Although they did not restrain Y.S.S.'s wife or son, a member of HONG CHANG's group remained on guard to prevent either of them from leaving.

   e. At the time of the attack, S.G.J.'s wife was on the top-floor of the Embassy, and hearing the commotion downstairs, she locked herself inside a room. When she heard hammering at the locked door, S.G.J.'s wife attempted to escape via the room's terrace, but

in doing so, fell to the ground. Despite sustaining various injuries, she was able to leave the Embassy compound. Once she was on the street, a passerby helped her and requested police and medical assistance.

  f. When the police arrived, S.G.J.'s wife told them about the attack on the Embassy. After establishing a security perimeter, three police officers approached the Embassy and knocked on the front door. HONG CHANG, wearing a pin bearing the face of the North Korean president on his jacket lapel and representing himself as a person in authority at the Embassy, answered the door. HONG CHANG informed the police that there was no problem in the Embassy and that if a person of North Korean nationality had been injured, the police needed to inform the Consulate officially.

  g. Inside the Embassy, three members of HONG CHANG's group took Y.S.S. to the basement. Two of the members of HONG CHANG's group identified themselves as belonging to a human rights association or movement for the liberation of North Korea and urged the captive Chargé d'affaires to leave North Korea. When Y.S.S. told them that he would not betray or desert his country, all but one of the members of HONG CHANG's group left the basement. Shortly thereafter, members of HONG CHANG's group tied up Y.S.S. and placed a bag over his head.

  h. For several hours, the captives inside the Embassy, except for Y.S.S.'s wife and son, remained bound. At times, members of HONG CHANG's group struck the captives. Members of HONG CHANG's group also systematically searched the Embassy. During the search, they seized a couple of pen drives, two computers, two hard drives

(one of which was used for storing images from the security cameras) and a mobile telephone.

   i. At approximately 9:40 p.m., five of the members of HONG CHANG's group left the Embassy in three Embassy vehicles. Spanish authorities later found these vehicles abandoned at different locations in Madrid.

   j. HONG CHANG, using the alias "Oswaldo Trump," arranged for an Uber to take him to nearby Toledo, Spain. At approximately 9:30 p.m., the requested Uber parked near police in front of the Embassy. However, at approximately 9:40 p.m., "Oswaldo Trump" cancelled his Uber service. Approximately six minutes later, "Oswaldo Trump" booked a new Uber service with a pick-up at an address near the rear of the Embassy. HONG CHANG and the remaining member of his group left the Embassy through the rear.

   k. At approximately 9:50 p.m., three North Korean students approached the Embassy. When one of the students called at the front door and received no response, he jumped over the fence and went to assist the captives, most of whom still were tied up. Shortly thereafter, Y.S.S. allowed the police to enter the Embassy premises and investigate the incident. Adjacent to the rear of the Embassy, the police discovered an Italian identity card in the name "Matthew Chao," bearing a photograph of a person resembling HONG CHANG, which Spanish authorities have determined is a forgery. In addition, the police discovered four machetes, imitation pistols, cable ties, and defensive spray. Spanish authorities have determined that HONG CHANG purchased the items from a store in Madrid that sells defense and security equipment on the morning of the Embassy attack.

l.  The following day, February 23, 2019, HONG CHANG arrived in the United States from Lisbon, Portugal. Spanish authorities determined that on that same day, "Oswaldo Trump" used an Uber service to travel from Newark Liberty International Airport in New Jersey to New York.

m.  On February 27, 2019, HONG CHANG met with representatives from the Federal Bureau of Investigation ("FBI") in New York. During that meeting, HONG CHANG admitted that he, with others, had carried out the raid on the North Korean Embassy in Spain days before. HONG CHANG also provided details of the attack. However, HONG CHANG claimed that he and the other individuals were carrying, but did not display, knives and Airsoft pistols. He also turned over to the FBI items seized from the Embassy.

7.  That I am informed and believe that HONG CHANG is a Mexican national and a Legal Permanent Resident of the United States. According to records obtained by Spanish authorities, "Adrian Hong" stayed at a hotel in Madrid, presented a Mexican passport (No. *****1009) as identification, and paid his bill with an American Express card associated with what appears to be a business address in Los Angeles, California. Hotel security images show HONG CHANG at the hotel. Following the Embassy attack, "Adrian Hong" did not return to the hotel, but instead contacted the hotel and requested that they send his belongings to an address in Los Angeles, California, that he claimed was his residence. HONG CHANG later contacted the hotel and said that someone would pick up his belongings on February 26, 2019.

8.  Although HONG CHANG has not revealed his current whereabouts to law enforcement, law enforcement has determined that

HONG CHANG resides at an address in Los Angeles different than the residential address that he gave to the hotel. According to the California Department of Motor Vehicles, HONG CHANG's California Driver's License (Number ****9764) lists his address as one identified by law enforcement. Public database searches also confirm that this second address is a residence associated with HONG CHANG. Further, on or about April 9, 2019, law enforcement saw HONG CHANG at this second address. Accordingly, law enforcement believes that HONG CHANG may be found within the Central District of California.

9. That the Government of the Spain has represented that it will submit a formal request for extradition supported by the documents specified in the Extradition Treaty, within the time required under the Extradition Treaty.

10. That HONG CHANG would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREUPON, complainant requests that a warrant be issued, based on probable cause, pursuant to Title 18, United States Code, Section 3184, for the arrest of HONG CHANG and the extradition treaty between the United States and Spain, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure

\\
\\
\\
\\
\\
\\
\\
\\

is needed for its execution, until such time as the warrant is executed.

DATED: This 9th day of April, 2019, at Los Angeles, California.

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division

/S/
_____
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Complainant
UNITED STATES OF AMERICA

Subscribed and sworn to before me this 9th day of April, 2019.

JACQUELINE CHOOLJIAN
_____
UNITED STATES MAGISTRATE JUDGE

9